IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


MARTIN WALKER, #319963              *

        Plaintiff,                 *

        v.                         *     Civil Action No. JKB-15-1889

WEXFORD HEALTH SOURCES, INC.        *
DR. PAUL MATERA, M.D.
DR. ARESAHEGN GETACHEW              *
DR. MICHAEL DOUGHTY, D. P. M.
BRUCE FORD P.A.                     *
JUDITH HEARTHWAY, N.P.
WARDEN KATHLEEN GREEN              *
ASSISTANT WARDEN RONALD DRYDEN
DR. JASON CLEM, M.D.                *
ROBERT HANKE[1]
DEPUTY COMMISSIONER CAROLYN        *
  ATKINS
S. GUSTUS                           *
C. SESSION
            Defendants.         *
                      *****


## MEMORANDUM

On June 25, 2015, the court received for filing Martin Walker's ("Walker") self-represented 42 U.S.C. § 1983 civil rights action.[2]  Walker seeks declaratory and injunctive relief and damages from medical personnel and prison administrators and staff at the Eastern Correctional Institution ("ECI") and Division of Corrections Headquarters.  Pending are Walker's motions for summary judgment, temporary restraining order, and preliminary injunction.  ECF Nos. 14-16 & 24-25.  Defendants Getachew, Matera, Clem, Ford, Hearthway, and Wexford Health Sources, Inc.'s ("Wexford") (collectively with Defendant Doughty, the

---

[1]      The Clerk shall enter this defendant's correct surname on the docket.

[2]      Walker also invokes this court's pendent jurisdiction under 28 U.S.C. § 1367 to raise state medical malpractice claims and allegations under Article 24 of the Maryland Declaration of Rights.

"Medical Defendants"), have also filed a motion to dismiss or, in the alternative, motion for summary judgment and opposition to Walker's motions (ECF No. 31), as well as a legal memorandum (ECF Nos. 31-1)[3] (collectively, "motions"), and an exhibit.[4]   ECF No. 32-2. Walker has filed oppositions and the Medical Defendants filed a reply.  ECF Nos. 46, 53 & 61.

Defendant Doughty has filed a motion to dismiss.  ECF No. 49.  Walker has filed an opposition and Doughty has filed a reply.  ECF Nos. 68 & 71.  In addition, Doughty has filed an opposition to Walker's motion for summary judgment.  ECF No. 81.  Walker asks that judgment be entered on the pleadings to which Doughty has filed an opposition and Walker has filed a reply.[5]  ECF Nos. 72, 81 & 84.

Defendants Dryden and Green have filed a motion to dismiss or, in the alternative, motion for summary judgment, and Walker has filed an opposition.  ECF Nos. 55 & 69.  Finally, defendants Atkins, Gustus, Hanke, and Session (collectively with Defendants Dryden and Green, the "State Defendants") have filed a motion to dismiss or, in the alternative, motion for summary judgment,[6] ECF No. 82, which Walker opposes, ECF No. 92.

The matter is ready for disposition; no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2014).  For reasons that follow, defendants' motions (ECF No. 31, 55 & 82), construed as motions for summary judgment, ARE GRANTED, as is defendant Doughty's motion to dismiss. Walker's various motions shall be denied.

---

[3]     All documents are referenced by their electronic filing number.

[4]     The exhibit at ECF 32-2 consists of 280 pages.

[5]     Doughty has also filed a response to Walker's Declaration of Events.  *See* ECF No. 75 & 93.

[6]     Walker has filed a motion to direct an answer by these defendants and additionally seeks the entry of default against them.  ECF Nos. 85-87.  The motions shall be denied as defendants have filed a responsive pleading.

# I. Background

Walker's self-represented complaint reads as a three-year running journal of his medical treatment or alleged lack thereof.  He alleges that he has a medical history of diabetes, in remission since 2012, resulting in neuropathy in both feet, causing him pain, tingling, burning sensations, and partial loss of sensation in his feet.  ECF No. 1 at p. 8.  Walker claims that the diabetes is in remission through diet and exercise regimens, but the exercise (regular daily walking) has caused him to suffer blisters and lesions on the "planter regions" of his feet, most recently in May of 2015.  He states that the lesion from May of 2015 is not fully cured, takes a lengthy period of time to heal, causes the formation of calluses, and results in painful walking.

Walker asserts that in February of 2012, he was admitted to the infirmary with a deep vein thrombosis (blood clot) in his right femoral area.  He claims he discontinued his Coumadin[7] therapy and was subsequently forced to go to the medical department on a daily basis over a six-month period to sign a release of responsibility and to see the prison psychiatrist due to his refusal to take the medication.  ECF No. 1 at pp. 8-9.  Two months later, in April of 2012, Walker alleges he saw Physician's Assistant ("P.A.") Ford for a large plantar blister on his left foot and was informed he would be provided "wound dressing material," suede insoles, and Keflex antibiotic to prevent infection.  He asserts that these items were never given to him. Walker further complains that in August and September of 2012 he saw Dr. Matera for his neuropathy, blisters, bunions, and toenail fungus (mycosis), but was only prescribed a topical

---

[7]     Coumadin (Warfarin) is an anticoagulant (blood thinner)  Warfarin reduces the formation of blood clot and is used to treat or prevent blood clots in veins or arteries, which can reduce the risk of stroke, heart attack, or other serious conditions.  *See* http://www.drugs.com/coumadin.html.

antifungal cream and compression stockings for his right leg edema.[8]  *Id*. at pp. 9-10.  He complains that these less expensive treatments were ineffective.

In February of 2013, Walker states that he saw Nurse Practitioner Hearthway who noted the ulceration of his left foot and edema.  He affirms that Hearthway ordered closed-toe stockings and moleskin pads to prevent new blisters and lesions.  Walker maintains that Wexford denied the request and he was instead given a supply of Band-Aids.  ECF No. 1 at p. 10.  He contends that from May of 2013 through May of 2014, he made regular and frequent visits to the nurse's clinic and was issued Band-Aids, medical tape, and gauze pads.  Walker claims that his complaints about foot issues were communicated to nursing staff, but other treatment was never offered.  *Id*. at p. 11.

It is also alleged that in June of 2014, a bloody discharge emanated from Walker's nineteen-month old wound, resulting in an appointment to address the problem.  He maintains when seen by P.A. Ford an x-ray was ordered as was Keflex antibiotic, which proved ineffective. *Id*. at p. 11.  The x-ray revealed a dislocation of the second metatarsal, unrelated to the wound. Walker maintains that he was prescribed seven days of "Betadyne" foot soaks to treat the wound, but was only given soaks for four days, and advised that the orders had been changed by a "wound specialist."  He claims that he was told that the wound was a diabetic foot ulcer and was to be packed and afforded immediate emergency treatment.  Walker seemingly claims that the nurse found the orders to be "incorrect" and no treatment was provided.  *Id.*

On July 10, 2014, Walker alleges that he was seen by Dr. Matera and admitted to the infirmary for five days with a possible infection of his ulcer and edema in his foot.  He was prescribed the oral antibiotic Bactrim and the intravenous antibiotic Timentin.  *Id*. at p. 12.  He

---

[8]     Walker claims that in November of 2012, he experienced another plantar blister on his right foot, but did not submit a sick-call slip because of "prior refusals to provide treatment."  ECF No. 1 at p. 10.

maintains that in August of 2014 he resumed normal activity, including exercises, and when seen by Matera in August of 2014, the physician noted the improvement to his wound and indicated he would see Walker in two weeks.  Walker claims the appointment did not occur, but Dr. Matera wrote up a note as if the consult had taken place.  Walker also claims he was "forced" to perform a self-debridement of dead tissue around the wound.  ECF No. 1 at p. 13.

Walker states that on September 25, 2014, he saw P.A. Oltman, who noted his blistering, bruising, and bunions and issued orders of Bactrim, tincture of benzoin,[9] and Lyrica.[10]  Walker claims that Dr. Clem changed the medication order to Neurontin[11] and he was not provided any treatment options.  *Id.* at p. 14.  He alleges that his ulcer condition relapsed and he informed medical personnel of the same in October of 2014, but his requested care was denied.  *Id.*

Walker asserts he was seen in November of 2014 by Dr. Druckman, who ordered no medication.  He states that when seen at the nurse's clinic ten days later he was provided antibiotics and his wound finally healed.  *Id.* at p. 15.  Walker maintains that although he was informed that an appointment with a wound specialist was scheduled, no consultation ever took place.  He claims that when seen by Matera and Ford in December of 2014 and January of 2015, consults were requested, but no treatment was offered.

Walker states that Dr. Getachew ordered Clem to provide a podiatry consult and to order orthopedic shoes on January 29, 2015, and he was seen by Dr. Doughty at Bon Secours Hospital

---

[9]        Benzoin tincture protects the skin from irritation.  It works by forming a barrier over the affected area.  *See* http://www.drugs.com/cdi/benzoin-tincture.html.

[10]        Lyrica (pregabalin) is an anti-epileptic drug, also called an anticonvulsant.  It works by slowing down impulses in the brain that cause seizures.  Lyrica also affects the chemicals in the brain that send pain signals across the nervous system.  *See* http://www.drugs.com/lyrica.html.

[11]        Neurontin (gabapentin) is an anti-epileptic medication, also called an anticonvulsant.  Gabapentin affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.  *See* http://www.drugs.com/neurontin.html.

("BSH") on February 20, 2015. He complains, however, that the only treatment provided by Doughty was to cut Walker's toe nails and to trim his calluses. Walker claims that over the next four months, while seen by medical personnel, he was not scheduled for an orthopedic shoe fitting and was not provided treatment for his foot issues. ECF No. 1 at pp. 16-18.

Walker also complains that his administrative remedy procedure ("ARP") grievances regarding his foot care were denied without conducting a thorough review.[12] *Id.* at pp. 13 & 17-20.

## II. Standard of Review

With the exception of Dr. Doughty, defendants' motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

---

[12] In an amended complaint received for filing on August 6, 2015, Walker added four new state defendants to his complaint. ECF No. 13. In addition, he raised additional claims about the submission of ARPs and the failure to conduct complete investigations into the grievances, including his access to the law library. Additional materials relate to Walker's administrative remedy procedure grievances and appeals, exhibits related to Walker's sick-call slips and prescription medication for toenail fungus, and an Administrative Law Judge administrative grievance and drug formulary documentation. ECF Nos. 44, 47 & 58. Whether construed as supplemental complaints or dispositive motions, these materials have all been reviewed and considered by the court.

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[13]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167. The court is more than satisfied that given the volume of exhibits presented here, it has ample information with which to address the motions as filed for summary judgment.[14]

---

[13]     In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte* unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

[14]     The purpose of a motion to dismiss filed pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint. *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

Summary judgment is governed by Rule 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:  By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).   In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to…the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

---

At this stage, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993)).  Because plaintiff is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007).  In evaluating the complaint, the court need not accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Ashcroft v. Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] ... that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679 (quoting Fed.  R. Civ. P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will...be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

Doughty seeks dismissal of the complaint, arguing that Walker has set out a "garden variety state tort claim" and has not complied with the mandatory arbitration provisions of the Maryland Health Care Malpractice Claims Act.  ECF No. 49.  Walker opposes the motion and Doughty has filed a reply.  ECF Nos. 68 & 71.  For reasons articulated by Doughty, the motion shall be granted.

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). But, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.

In the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because Walker is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III. Discussion

### A. Medical Defendants

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[15] *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

---

[15] A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown*, 240 F.3d at 390 (citing *Liege v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)). Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LaFevers*, 423 F. Supp. 2d 1064, 1070-71 (C.D. Cal. 2006).

The materials indicate that Walker is a sixty-three-year-old man with a medical history significant for hypertension, diabetes, deep vein thrombosis ("DVT"),[16] chronic right toe

---

[16]     Deep vein thrombosis (DVT) occurs when a blood clot (thrombus) forms in one or more of the deep veins in the body, usually in the legs. *See* http://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/basics/definition/con-20031922.

dislocation of the second metatarsal, onychomycosis,[17] and neuropathy[18] secondary to his diabetes.  The Medical Defendants argue that Walker's diabetes makes him more susceptible to foot ulcers and causes them to heal more slowly.  They assert that he has been routinely educated regarding behaviors and activities that will increase his risk of foot ulcers and has been advised to stay off his feet as much as possible when he has ulcers to facilitate healing.  ECF No. 31-4 at Clem Aff.  They maintain that Walker's walking up to eight miles a day causes foot ulcers and delays and prevents the prompt healing of his wounds.[19]  *Id.*

The record shows that Walker was seen by P.A. Ford on July 16, 2012, for a Chronic Care Clinic ("CCC") visit related to cardiovascular issues and diabetes.  ECF No. 32-2 at pp. 1-4.  Walker refused to take his Coumadin prescription, so Ford discontinued it.  During that visit, Walker denied having foot ulcers, slow healing wounds or sores, and the burning of extremities.  He was prescribed Maxzide, Lopressor, Zocor, Fish Oil, Aspirin, Glucophage, and Lisinopril.  *Id.*

On August 23, 2012, he was seen by Nurse Kenney for complaints of foot callus and abrasion.  *Id.* at pp. 5-6.  Kenney observes that Walker had a callus with a blister on his right big toe and a small abrasion caused by rubbing on his left foot.  Signs and symptoms of infection were noted.  It was recommended that Walker receive foot soaks and Bactrim and he was referred for further evaluation.  *Id.*  On August 29, 2012, Walker was seen by Dr. Matera for his

---

[17]     Onychomycosis is a fungal infection of the toenails or fingernails that may involve any component of the nail unit, including the matrix, bed, or plate.  *See* http://emedicine.medscape.com/article/1105828-overview.

[18]     Nerve damage from diabetes is called diabetic neuropathy.  About half of all people with diabetes have some form of nerve damage.  *See* http://www.diabetes.org/living-with-diabetes/complications/neuropathy.

[19]     The medical defendants further argue that Walker has repeatedly refused sick-call visits, the drawing of blood, medications, periodic physical examinations, medical diets, and chronic care and wound care clinic visits.

"increased" neuropathy, foot sores, and toe nail fungus.  *Id*. at pp. 7-8.  Matera did not note any objective signs of infection, but provided Walker a tube of antifungal cream.  A lower dose of the Glucophage and Fish Oil was prescribed.  *Id*.

On September 19, 2012, Walker was seen by Matera for a scheduled provider visit related to his vision, foot, and leg issues.  ECF No. 32-2 at pp. 9-10.  Walker complained of right leg edema (swelling), the same leg as his DVT.  An order for anti-embolism TED stockings was placed and Walker was advised of the risks associated with his decision to refuse Coumadin.  A bunion was noted on Walker's right big toe, with no skin breakdown.  The stockings were received on September 21, 2012.  *Id*.

On February 19, 2013, Walker was seen by Nurse Practitioner Hearthway for a CCC visit related to his hypertension, foot blisters, and neuropathy.  Hearthway noted that Walker only seemed to be concerned about his ability to exercise and complained that his TED stocking "bunched up" under the ball of his foot, causing blisters and irritation.  *Id*. at pp. 15-17.  Walker claimed that he needed Lyrica for his neuropathy and was informed by Hearthway that the medication was inappropriate for "occasional (neuropathic) symptoms."  *Id*. at p. 15.

On March 6, 2013, Walker was seen by Dr. Matera for a follow-up visit regarding his hypertension.  He agreed to take a low dose of Clonidine and Hydrochlorothiazide.[20]  *Id*. at pp. 18-19.  On March 12 and March 27, 2013, Walker was seen by medical personnel related to his hypertension and raised no issues regarding his feet.  *Id*. at pp. 20-22.  He refused to be seen for his periodic physical evaluation in April of 2013.  *Id*. at p. 245.

---

[20]     Clonidine tablets (Catapres) and Hydrochlorothiazide may be used alone or in combination with other medications to treat high blood pressure.  *See* https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html   and   Hydrochlorothiazide   and https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.htmlHydrochlorothiazide.

On May 21, 2013, Walker was seen by Nurse Practitioner Asem and complained of a blister on his left big toe caused by his shoe rubbing against his foot and right leg swelling. He was educated regarding the wearing of his TED stockings and keeping his legs elevated when resting. A daily multivitamin was added to his medication regimen and he was placed on a cardiovascular diet for one year. An order for moleskin pads for Walker's feet and closed-toe TED stockings was placed and approved by Dr. Clem on May 23, 2013. ECF No. 32-2 at pp. 24-26.

On May 24, 2013, Walker was seen by Nurse Brunke for a blood pressure check and for a blister on his big left toe. Brunke noticed a small area of blood on Walker's toe under the skin at the blister location. The blister was not opened and Walker denied pain. No active bleeding or drainage was noted. *Id*. at pp. 27-28. From June through July of 2013, Walker was seen for his hypertension. His Lisinopril medication was increased and the drug Norvasc was added to his prescription regimen. Walker twice refused to have his blood drawn. *Id*. at pp. 29-33, 246-47 & 250-51.

On August 13, 2013, Walker was seen by Nurse Osborne in the CCC related to his hypertension. He reported that his leg swelling had resolved and he voiced no other complaints or concerns. He refused to be seen for an August 31, 2013, sick-call visit. *Id*. at pp. 35-36 & 252. On October 31, 2013, Walker was seen by Nurse Practitioner Osborne in the CCC for his hypertension and diabetes. *Id*. at pp. 38-39. He made no other complaints during the course of this visit.

On December 17, 2013, prison custody officers brought thirty-two unopened blister packs of medication found during a search of Walker's cell to the medical room. The medications included Metoprolol Tartrate, Simvastatin, fish oil, Lisinopril, Norvasc,

Hydrochlorothiazide, Acetylsalicylic Acid, and a multivitamin.[21]   *Id*. at pp. 40-41.   The following day, Walker refused all of his medications.   *Id*. at p. 256.

On January 24, 2014, Walker was seen by Certified Nurse Practitioner Krieger in the CCC.   He claimed that he was "at war with the medical department" and declined medical treatment and evaluation during the visit.   ECF No. 32-2 at pp. 43-44 & 257.   In February, March, April, and May of 2014, Walker refused to be seen in the CCC or for his periodic physical examination.   *Id*. at pp. 258, 263-65, 266-67, & 270.

On June 8, 2014, Walker was seen by Nurse Knauer for his complaints of a foot wound. Upon examination, Walker's right foot showed active bleeding secondary to a superficial injury to the skin.   Walker was referred for further evaluation.   Two days later, Walker requested that Nurse Kenney treat only his foot.   Kenney noted that Walker had been refusing CCC visits since February of 2014.   ECF No. 32-2 at pp. 45-48.   He was later seen by P.A. Ford for a CCC visit related to Walker's hypertension and diabetes.   Walker refused all medication, but accepted treatment for his foot.   Ford ordered x-rays of Walker's feet and Keflex for his foot ulcers.[22]   *Id*. at pp. 49-50.

On June 16, 2014, Walker's foot x-rays were read and diffuse sclerosis and expansion of the first metatarsal and dislocation of the second metatarsal joint was observed.   No acute fracture or dislocation was evident.   *Id*. at p. 229.   On June 19, 2014, Walker was seen by P.A. Oltman for a scheduled provider visit regarding his x-rays.   A wound was noted on Walker's right foot, which he described as a non-healing diabetic ulcer.   Oltman observed that Walker was

---

[21]   These medications are prescribed to treat hypertension, reduce cholesterol and triglycerides, and prevent fluid retention and blood clot formation.   *See generally* ECF No. 32-2.

[22]   The medical defendants maintain that in response to Walker's continuing refusals of medical care, he was referred to a psychiatrist to determine whether he was competent to make such decisions.   The psychiatrist, Dr. Talmadge Reeves, determined that Walker was competent to make his own medical decisions.   ECF No. 32-2 at pp. 51-56.

being treated with antibiotics and received regular wound care.  *Id*. at pp. 58-59.  He ordered

betadine soaks for Walker's foot for one week and placed a request for a podiatry consultation.

*Id*.  The following day, on June 20, 2014, Walker was seen by Nurse Twilley in the wound care

clinic.  She observed no signs or symptoms of infection and Walker was given a foot soak and

fresh bandages.  He denied any further complaints.  ECF No. 32-2 at p. 60.  The medical

defendants note that from June 20, 2014, through July 7, 2014, Walker was seen twelve times in

the wound care clinic for his foot ulcer.  No signs or symptoms of infection were observed.  *Id*. at

pp. 61-76.

On July 5 and July 16, 2014, medical assignment orders were issued restricting Walker

from the courtyard, gym, or weightlifting, excusing him from work, and placing him on bedrest.

*Id*. at pp. 234-36.  On July 10, 2014, Walker was seen by Dr. Matera, who noted that the foot

was now infected.  Walker was admitted to the infirmary, where a wound culture was taken and

Walker was placed on intravenous antibiotics.  X-rays and lab studies were ordered.  *Id*. at

pp. 230-32.  On July 11, 2014, Walker was seen by Dr. Clem, who noted that the foot was not

improving despite the use of Bactrim.[23]  Clem prescribed Timentin[24] for one week.  *Id*. at pp. 77-

80.  On July 14, 2014, x-rays were read and showed no changes from the x-rays taken the

preceding month.  *Id*. at p. 231.  Walker remained in the infirmary until July 16, 2014, and was

seen twice daily for his right plantar forefoot ulcer.  He noted improvement while in the

infirmary, but despite being told to keep off his feet, he was observed walking quickly around his

---

[23]     Bactrim contains a combination of sulfamethoxadole and trimethoprim, which are both antibiotics that treat different types of infection caused by bacteria.  *See* http://www.drugs.com/Bactrim.html.

[24]     Timentin is a sterile injectable antibacterial combination consisting of the semisynthetic antibiotic ticarcillin disodium and the β-lactamase inhibitor clavulanate potassium (the potassium salt of clavulanic acid) for intravenous administration.  *See* http://www.rxlist.com/timentin-drug.htm.  It is indicated for lower respiratory, bone and joint, skin and skin structure, urinary tract, and intra-abdominal infections.  *See* http://www.empr.com/timentin/drug/1816.

room for exercise.  When discharged from the infirmary, he was advised by Dr. Clem not to resume his previous exercise regimen.  *Id*. at pp. 81-122.

On July 23, 2014, Walker was seen by Matera for a scheduled provider visit.  He stated that his foot was much improved and he was observed walking without difficulty.  Walker had been placed on bedrest and feed-in status to allow him to stay off his feet.  Matera added Epsom foot soaks to Walker's regimen for a two-week period and he received "regular" foot soaks between July 23, 2014, and August 3, 2014.  ECF No. 32-2 at pp. 123-33.  On August 6, 2014, Walker was seen by Matera for his foot.  He was advised to keep his foot clean and dry and to let the foot air dry.  A podiatry consultation request was submitted.  *Id*. at pp. 134-35.

On August 24, 2014, Walker declined his regular foot soaking, declaring he was taking care of it himself, was walking about eight miles a day, and did not require gauze any longer, just Band-Aids.  *Id*. at p. 136.  When seen by Matera on August 27, 2014, the physician observed that Walker was deciding what treatment he would and would not accept.  Clem placed a note in Walker's file noting that it was suggested by "collegeal" that Walker be provided with custom shoes as an alternative treatment plan and a podiatry consult if the shoes were ineffective.  *Id*. at pp. 137-39.

On August 29, 2014, Walker was seen by Nurse Twilley for his request for bandages.  He indicated that he was walking nine miles a day and was provided bandages, but declined Twilley's suggestion that he submit a sick-call slip requesting an evaluation of his foot.  *Id*. at p. 140.  On September 9, 2014, Walker signed off on all medical restrictions.  *Id*. at p. 276.  On September 13 and 20, 2014, Walker was seen by Twilley for his foot.  He did not want to be

reevaluated and only requested bandages.[25]  He again informed Twilley that he would not stop walking and again acknowledged that he walked eight miles a day.  *Id*. at pp. 142-43.

On September 25, 2014, Walker was seen by P.A. Oltman for a provider visit related to his foot.  Walker described the ulcer as a diabetic, non-healing ulcer.  Oltman objectively observed spreading, grouped blisters on Walker's foot, black in color.  Oltman placed a non-formulary request for Lyrica.  The request was approved by Dr. Clem.  ECF No. 32-2 at pp. 144-47.  The following day, however, Oltman decided to replace the Lyrica with Neurontin.  ECF No. 31-4 at Clem Aff.

On October 24, 2014, Walker was seen by Matera for complaints of a right foot infection.  Upon examination, Matera saw objective signs of a superficial injury to the skin with peeling and cracking of the skin.  Signs and symptoms of infection were also noted.  Clem was notified of Matera's findings and ordered that Walker be placed on strict bedrest until he could be seen by a provider in four days.  *Id*. at pp. 148-49.

On October 28, 2014, Walker was seen by Nurse Practitioner Hearthway for a provider visit related to his foot.  He informed Hearthway that his foot was almost healed, but complained of pain on the dorsal surface of his right foot, which was swollen and tender at the base of the second toe, the location of Walker's chronic dislocation.  Walker indicated he did not want the Neurontin prescribed for him.  *Id*. at pp. 150-51.  Upon examination, Hearthway found no signs or symptoms of infection and no subjective complaints of pain.  Walker requested to be placed on Naproxen[26] and a diuretic and informed Hearthway he was self-treating with tincture of

---

[25]     Walker was provided replacement bandages and gauze by Nurse Moses-Coston on September 2, 2014.  ECF No. 32-2 at p. 141.

[26]     Naproxen is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat pain or inflammation caused by conditions such as arthritis, tendinitis, bursitis, gout, or ankylosing spondylitis. *See* http://www.drugs.com/naproxen.html.

benzoin.  Hearthway saw evidence of shaving and excoriation from shaving, as if Walker had been self-debriding his callus and ulcer.  Hearthway told Walker he should not do this, directed him to return the benzoin, ordered daily Epsom salt foot soaks, discontinued the Neurontin, and prescribed Naproxen.  ECF No. 32-2 at pp. 150-51.  Walker's medical restrictions were lifted. *Id.* at p. 237.

Two days later, on October 30, 2014, Walker was seen by Hearthway for a scheduled visit regarding his foot wound, hypertension, and diabetes.  Walker indicated that he was walking at least seven miles a day and his symptoms had "dramatically improved."  *Id.* at pp. 155-56.  His foot soaks were continued for two weeks.  Further, as Walker's blood sugars had consistently been within a normal range, Hearthway removed his diabetes as a chronic care issue.  Henceforth, he was to be seen regularly for his foot-related issues.  *Id.*

On November 14, 2014, Walker was seen by Dr. Druckman for his complaint of a swollen toe and calf.  He indicated that his ulcer was healing, but his second right toe was swollen at the site of the chronic dislocation.  Druckman ordered the continuation of the Epsom salt foot soaks, an intertoe fungal medication, and an x-ray.  *Id.* at pp. 157-58.  Between November 14, 2014, and December 6, 2014, Walker received regular Epsom salt foot soaks and voiced no complaints during these visits.  *Id.* at pp. 159-65 & 167-74.

On December 2, 2014, Walker's x-rays were read.  No significant changes were observed from his prior x-rays.  *Id.* at p. 233.  On December 6, 2014, Walker was seen by Nurse Jenkins for a scheduled foot soak.  Jenkins noted a thick yellow callus at the ball of the right foot.  When questioned, Walker acknowledged that he was still walking several miles a day.  Jenkins informed Walker that his activity was worsening his condition and preventing healing.  Walker informed Jenkins that he disagreed with her assessment.  Later that same day, Walker saw Dr. Druckman to review the x-ray results.  Bone changes were noted consistent with his "chronic

process" and "without a history of trauma." Druckman recommended that Walker be clinically assessed and noted that he possibly required an MRI. The Epsom salt foot soaks continued through December 16, 2014. *Id*. at pp. 175-84.

On December 18, 2014, Walker was seen by Dr. Matera related to his foot wound. ECF No. 32-2 at pp. 185-86. Matera noted that Walker had declined to be placed on bedrest or feed-in status or to limit his activity. Matera noted that Walker had been taking his infection medication and using his antifungal cream. He ordered an MRI of Walker's foot and placed a referral for an orthopedist. *Id*.

On January 8, 2015, Clem placed a note in Walker's file noting that a request had been made for a telemedicine evaluation with Dr. Getachew. *Id*. at p. 187. On January 29, 2015, the consultation occurred. Getachew recommended an orthotic evaluation, based on Walker's neuropathy issues and diabetes, and a fitting for custom orthotic shoes. *Id*. at pp. 192-93.

On February 20, 2015, Walker was seen at BSH for a podiatry consultation with Dr. Doughty. Walker reported he was there for nail care, claiming that his toenails were painful on walking and in various shoes. On evaluation, no open lesions or signs or symptoms of infection were observed. Painful lesions were noted bilaterally in addition to chronic metatarsal dislocation. *Id*. at pp. 217-24. Doughty recommended manual debridement of Walker's nails and foot ulcers and performed a debridement procedure on three lesions without incident. He further recommended that Walker be fitted for orthopedic shoes and inserts and that he be placed on Lyrica or Neurontin for pain and Lamisil for toenail fungus. No recommendations were made for surgical intervention or for an MRI for Walker's chronic right metatarsal dislocation. *Id*.

On March 12, 2015, Dr. Matera reviewed Walker's patient's notes. Matera noted that although Walker had been sent to BSH for evaluation and treatment of his right foot including infection and possible osteomyelitis, this had not been addressed by Dr. Doughty. Matera placed

a consult request with Hanger consultants for Walker to be fitted for custom orthopedic shoes per Doughty's recommendation.  *Id*. at pp. 195-96.  On April 8, 2015, Walker was seen by Dr. Matera for a provider visit related to his foot.  He informed the physician that he was still walking eight miles daily and that his neuropathy had resolved.  Upon examination, Walker's foot was no longer swollen, no open wounds were observed, and his gait was found to be stable.  ECF No. 32-2 at pp. 197-98.  The consultation for orthopedic shoes remained pending.

On May 21, 2015, Walker was seen by Nurse Marshall for complaints of left foot wounds.  Two wounds were observed on the bottom of Walker's left foot.  The wounds were not open or draining, and no signs or symptoms of infection were observed.  *Id*. at pp. 199-200.  On May 27, 2015, Walker was approved for custom orthopedic "diabetic" shoes and was fitted for the shoes and insoles on June 8, 2015.  ECF No. 32-2 at pp. 201 & 225-27.  The shoes were received and signed for on September 16, 2015.  *Id*. at pp. 208-09.

On June 10, 2015, Walker was seen by Nurse Marshall for complaints regarding toenail issues.  Examination showed superficial injury to Walker's skin, with cracking and peeling observed.  No signs or symptoms of infection were noted.  *Id*. at pp. 203-04.  Walker was educated regarding proper foot hygiene, given recommendations for medical restrictions regarding bedrest and feed-in, and advised on contraindicated behavior.  Walker signed off on all restrictions.  *Id*. at pp. 203-04 & 238-39.

On June 30, 2015, Walker was seen by Dr. Matera for his blood pressure, which had been highly elevated.  He refused treatment, was upset that he had yet to receive his orthopedic shoes, and otherwise raised no new complaints.  *Id*. at pp. 205-07.

On September 17, 2015, Walker was seen by P.A. Stanford for a CCC visit related to his cardiovascular and onychomycosis issues and plantar warts.  *Id*. at pp. 214-16.  Stanford noted that Walker was refusing his hypertension medications and informed Walker that treatment of

onychomycosis with Lamisil was not a long-term solution because of potential liver function complications.  Walker agreed to have lab work done so he could potentially begin treatment with Lamisil.  Stanford noted that if Walker's lab work was suitable he would be placed on Lamisil for twelve weeks.  ECF No. 32-2 at pp. 214-16.

In response to the Medical Defendants' motion, Walker's opposition sets out his various claims and maintains that defendants have repeatedly sought to "obfuscate" the issues and to "blame their violations on the plaintiff."  ECF No. 46.  He alleges that his § 1983 claims against Wexford are based on its supervisory liability and that its liability under state law and malpractice is premised upon respondeat superior.  He states that he has "rarely" been advised to stay off his feet and providers have repeatedly ordered him to continue his exercise regimen. Walker states he was never provided moleskin and there was no point in continuing his foot soaks since they did nothing to heal his wounds.  *Id*.

Walker further claims that certain toenail fungal treatments were not available from Wexford and takes issue with the cautionary advice given to him regarding Lamisil medication. *Id*.  He claims that the case has nothing to do with a difference of opinion over treatment, but concerns the denial, delay, and failure to provide treatment for his feet.  Walker seemingly claims that there is a "lack of [Federal Drug Administration] approval" for Neurontin.  He maintains that defendants have repeatedly indicated that the pain he suffers is "worst when standing still or reclining, not while walking, and that walking actually provides [him] some relief. *Id*.

Walker additionally argues that merely being seen in the clinics was inadequate.  He raises numerous claims, chief among them that: he was not referred to a wound specialist for a two-month period in 2014, he was not always prescribed "effacious" medications, he was not provided necessary care for his onychomycosis as anti-fungal creams are insufficient without

oral anti-fungal medication, he was frequently advised of the importance of exercise, and custom shoes, provided after years of delay, only made the problem worse, and he was not provided care for the metatarsal dislocation.  He provides a running commentary on each of the exhibits provided by the Medical Defendants and a diagram reflecting his subjective opinion of the relevancy of the Medical Defendants' exhibits and affidavits.  ECF No. 46.

In their reply, the Medical Defendants argue that Walker's opposition merely "regurgitates" his disagreement with the treatments and medical assignments provided for his foot issues and attempts to downplay the extent of his non-compliance with his prescribed medical treatment plan.  They maintain that Walker has failed to show deliberate indifference on their part.  ECF No. 53.  They further assert that Walker continues to receive care for his foot condition and has been scheduled to receive an adjustment to his orthotic shoes.  ECF Nos. 53 & 54-2 at pp. 16-38.

In his surreply, Walker repeats his claim that he was told to continue his exercise to control his diabetes and that while in the infirmary he was ordered to increase his activity levels.  ECF No. 61.  He alleges that the Medical Defendants' conservative treatment, consisting of Band-Aids and foot soaking, was inadequate for his foot conditions.  Walker contends that he is being denied the "myriad of options" available for treatment of onychomycosis.  *Id.*

### B. State Defendants

Title 42 U.S.C. § 1983 medical liability on the part of prison and administrative remedy procedure administrators requires a showing that "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted).  Moreover, the law in this

Circuit dictates that no constitutional entitlement to grievance procedures or access to such procedures is created merely because such procedures are voluntarily established by a state.[27] *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

Walker claims that ECI Warden Green, Assistant Wardens Dryden and Hanke, Headquarters ARP Coordinator Session, Institutional ARP Coordinator Gustus, and Commissioner Atkins ("State Defendants") were deliberately indifferent to his medical conditions as they failed to satisfactorily investigate the ARP he filed regarding his medical treatment. These defendants assert that they play no role in making medical decisions and do not have any authority over the decisions of health care staff. ECF Nos. 55-3 & 82-3 at Green Decl. They further argue that Walker has no right to participate in an administrative grievance process, let alone a right to demand that personal interviews and further investigation be conducted into the remedies.

In response, Walker claims that the State Defendants' attachment contains "little of substance" and shows the same lack of care and indifference given to their handling of grievances. ECF Nos. 69 & 92. He further contends that they have not responded to his access-to-courts claim; they failed to adhere to their own written regulations regarding the ARP process; and they have no entitlement to qualified immunity. *Id*.

## IV. Analysis

Walker's medical claims against Medical Defendants Clem, Ford, Getachew, Hearthway, Matera, and Wexford are subject to dismissal. The record speaks for itself and establishes that medical providers did not refuse to provide him care for his feet. His foot and leg conditions

---

[27] It is arguable that if certain acts or omissions relating to the processing of inmate grievances interfere with an inmate's constitutional right to access the courts, a colorable claim may be stated. *See Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995).

were routinely assessed in the CCC, wound care, and nurse's clinics, and Walker has received conservative medical care from nurses, P.A.s, and physicians in the form of pain medication, antifungal cream, antibiotics (both oral and intravenous), betadine and Epsom salt foot soaks, debridements, diabetic shoes, TED stockings, and bandages.  He was treated in the infirmary for a foot infection in July of 2014.  X-rays of his feet and blood laboratory tests were conducted on several occasions.  He was placed on bedrest and feed-in status.

Medical knowledge garnered by a layperson, whether from the Internet or through other materials, may prove dangerous if relied on by that person in shaping his own opinions.  The materials placed before the court show that Walker's own refusals and non-compliance with recommended courses of treatment while imprisoned have caused him further injury.  He has refused, hoarded, and demanded certain medications; continued to engage in heavy-duty ambulatory physical activity, despite being told to stay off his feet;[28] and "debrided" his own feet with a razor.

The record evidence indicates that Walker's requests are considered, his needs are addressed, and he is urged by medical staff to keep them informed of any further episodes or serious symptoms.  Moreover, there is no showing that the State Defendants interfered with Walker's medical care.  *See Shaw v. Stroud*, 13 F.3d, 791, 799 (4th Cir. 1994); *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990).  Further, his dissatisfaction with the manner in which the State Defendants conducted their review and investigated his ARPs does not set out a claim under *Adams*.[29]

---

[28]     Walker alleges that he was told to exercise in light of his medical conditions.  Indeed, the medical record references an "exercise program" initiated and the "importance of exercise."  It also notes that Walker was advised "not to exercise other than what is required for Activities of Daily Living ("ADL")."  The court questions whether walking six to eight miles a day falls with the limits of such.

[29]     In light of this decision, the court need not address defendants' qualified immunity argument.

A constitutional violation cannot be sustained upon the facts of this case.  Judgment will be entered in favor of all defendants in a separate Order to follow.[30]


Date: <u>March 2, 2016</u>                          _____/s/_____
                                                    James K. Bredar
                                                    United States District Judge

---

[30]     Walker attempts to bring negligence and state law claims against defendants.  However, even if these defendants' conduct rose to the level of negligence, such claims are not actionable under § 1983.  *See Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  The court declines to take pendant jurisdiction over the claims.